UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEETZ FAMILY, LLC, ) | |
| ) | CIVIL ACTION |
| Plaintiff, ) | |
| ) | NO. 16-10790-TSH |
| v. ) | |
| ) | |
| RUST-OLEUM CORPORATION, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND MEMORANDUM ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 118)

**October 29, 2018**

**HILLMAN, D.J.**

Deetz Family, LLC ("Plaintiff") asserts claims against Rust-Oleum Corporation ("Defendant") for breach of contract. Defendant moves for summary judgement pursuant to Fed. R. Civ. P. 56. For the reasons stated below, Defendant's motion for summary judgment (Docket No. 118) is ***denied***.

### Background

Dayton J. Deetz, the sole inventor of U.S. Patent No. 5,609,788 ("Magnetic Paint Additive", issued March 11, 1997) and U.S. Patent No. 5,843,329 ("Magnetic Paint or Ink Additive", issued December 1, 1998), assigned his rights in both patents to Fibron, LLC on January 29, 2001. On April 20, 2005, Defendant and Fibron entered into a License Agreement (the "Agreement") that granted Defendant non-exclusive rights to the patents and related "Know-How" to manufacture, have made, and use and sell, magnetic paint products. The terms of the Agreement required Defendant to pay an up-front fee of $100,000 USD and royalties equaling 3% of net sales

from April 20, 2005 until March 17, 2015 (the expiration date of the licensed patents), and 2% of net sales from March 18, 2015 until March 17, 2020. The Agreement also provided for payment of a minimum royalty of $20,000 in 2006, $30,000 in 2007, and $40,000 per year for the remaining years of the Agreement, in the event that actual royalties calculated from net sales fell below these thresholds. Section 17 of the Agreement states that the contract shall be interpreted under Illinois law.

On February 15, 2006, Fibron assigned and transferred all of its rights in the '788 and '329 patents, as well as its rights in the Agreement, to Plaintiff. Defendant made the $100,000 up front payment and paid at least part of actual royalties from 2006-2009, but from 2006-2010 did not pay the minimum royalties required under the license. Without notifying Plaintiff of any intent to terminate the Agreement, Defendant ceased making payments in 2010, and did not respond to Plaintiff's demand letters regarding royalty reports and overdue payments in August and September of 2013. On September 27, 2013, Plaintiff sent a letter notifying Defendant that the License Agreement would be terminated on October 27, 2013, and followed up with a letter on February 18, 2014 confirming termination of the Agreement.

Plaintiff alleges that Defendant continued to use Plaintiff's "Know-How" to make and sell the licensed products until March 17, 2015, after it stopped paying royalties and in breach of the Agreement.

**Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute precludes summary judgment if it is both "genuine" and "material."

2

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id*.

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). It can meet its burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the nonmoving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005), *aff'd*, 442 F.3d 7 (1st Cir. 2006) (quoting *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548). Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548). When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

## Discussion

### 1. Contract Interpretation

In *Farm Credit Bank of St. Louis v. Whitlock*, the Illinois Supreme Court held that "[a] contract will be considered ambiguous if it is capable of being understood in more sense than one. 144 Ill. 2d 440, 447, 581 N.E.2d 664 (1991). "Where a court determines that a contract is ambiguous, its construction is then a question of fact" and "the intent of the parties must be

determined from an examination of extrinsic evidence by the trier of fact." *Id.* at 447-48, 581 N.E.2d 664.

Defendant contends that it was not obligated to pay royalties for its continued use of Plaintiff's "Know-How" because, as the terms of the Agreement suggest, Defendant was only required to make those payments if it intended to retain its rights under the Agreement. (Docket No. 123 at 10). According to the Agreement, Defendant "shall have the right to make up the difference between the royalties paid and the minimum royalty at the time of payment of the royalty for the 4th Quarter of any year." (Docket No. 124-6 at 5). Defendant correctly notes that it had a right but not an obligation to pay royalties. The parties disagree, however, as to the implications of Defendant's decision whether or not to exercise that right.

Defendant argues that if it used Plaintiff's "Know-How," the Agreement gave Defendant the right to use it. According to the Agreement, "[t]he term of this Agreement shall end five years after the expiration of the last of the Patents, or if a court with competent jurisdiction over the patents determines such patents are invalid and unenforceable, unless terminated sooner for any reason provided herein, LICENSEE shall have the right to continue to use the Know-How beyond the term of this Agreement." *Id.* Thus, Defendant argues that after Plaintiff terminated the Agreement for Defendant's failure to pay royalties, Defendant could still use Plaintiff's "Know-How" according to the Agreement's plain terms.

Plaintiff argues, however, that "only a fool would negotiate for such a result." *Newman-Green, Inc. v. Alfonzo-Larrain R.* 832 F.2d 417, 421 (7th Cir. 1987) (interpreting an Illinois contract to require continued royalty payments after the termination of an agreement). Defendant's interpretation of the Agreement essentially means that Defendant "could contract with Deetz to pay for Deetz's Know-How, that Rust-Oleum could breach the contract by not paying for the

4

Know-How, and that Rust-Oleum could continue to use the Know-How that it did not pay for." (Docket No. 137 at 9). While Defendant claims that it paid $100,000 for continued use of the "Know-How," Plaintiff notes that the terms of the Agreement are clear that the payment was only an initial licensing fee and did not fully compensate Plaintiff for continued use of the "Know-How." (Docket No. 126 ¶ 12).

Further, per the terms of the Agreement, Defendant agreed to pay royalties of 3% of its Net Sales until the patent expiration date, i.e. March 17, 2015, and 2% of its Net Sales for a period of five years after the expiration of the patents, i.e. March 17, 2020. Thus, if Defendant's interpretation were accepted, it would undermine the entire royalty structure established in the Agreement. According to Plaintiff, "the parties' intent as inferred from the agreement was either that Rust-Oleum would pay Deetz through the term, i.e. through March 17, 2020, and use the rights granted or Rust-Oleum would not use the rights granted if it chose not to pay." (Docket No. 126 ¶ 10). Therefore, Plaintiff argues that Defendant was obligated to pay royalties for its continued use. (Docket No. 137 at 10). *See Newman-Green*, 832 F.2d at 422 ("It is logical to treat the obligation to pay royalties as running with the sale of the [widgets]; only when the termination has been completed (by the cessation of sales and the return of the equipment) does the contractual obligation to pay royalties cease.").

I find that a plain reading of the Agreement would give Defendant the right to use Plaintiff's "Know-How." That reading, however, would be inconsistent with the obligation to pay royalties for the "Know-How" until March 17, 2020. Thus, the Agreement "is capable of being understood in more sense than one." According to Illinois law, this ambiguity presents a genuine dispute of fact as to the intent of the parties. As such, summary judgement is not appropriate.

 2. *Factual Issue of Whether Defendant Used Plaintiff's "Know-How"*

Defendant still may be entitled to summary judgment, however, if it can demonstrate that it did not use Plaintiff's "Know-How" as this showing would render the contractual ambiguity irrelevant. Defendant contends that it developed its solvent-based magnetic paint based on its prior work with metallic and water-based magnetic paint and did not use any of Plaintiff's "Know-How" or proprietary information. First, Defendant contends that it began working with magnetic paints long before the Agreement evidenced by its development of a water-based magnetic paint in 2002. (Docket No. 124 ¶ 21). Moreover, according to Mr. Morrison, one of Defendant's chemists, Defendant began working with metallic paints many years before its dealings with Plaintiff. While these paints were not magnetic, Defendant argues that they contained suspended metal additives—an important design consideration for any magnetic paint. *Id.* ¶ 20. Defendant argues that it used the formula from these metallic paints as the foundation for its solvent-based magnetic paint. (Docket No. 121 at 8).

Plaintiff alleges, however, that Defendant "knew nothing" about magnetic paints and used his "Know-How" to manufacture its solvent-based paints. Deetz Dep. 289:1-7. First, Plaintiff argues that Defendant inappropriately relies on paint formula sheets as evidence that it began working with magnetic paints in 2002 because those sheets "display a revision date of 2007." (Docket No. 125 at 8). According to Mr. Morrison, the formula sheets are only reliable as of the revision date. *See* Morrison Dep. 30:20-31:3. In fact, Defendant's first solvent-based formula explicitly states, "Formula taken from Joe." (Docket No. 135 at 302). Further, Defendant's documents show that Alex Parker assisted Joe Burnette with the solvent based formula and it was Alex Parker who primarily worked with Plaintiff to obtain his "Know-How" under the Agreement. (Docket No. 126 ¶ 39). Finally, Neal Barry confirmed that following discussions with Joe Deetz were "the first time Rust-Oleum had started working on magnetic paints and primers." Barry Dep.

15:16-22.  Similarly, Mr. Morrison admitted that Defendant had never done any work with magnetic paints or primers before working with Plaintiff. Morrison Dep. 14:16-15:3.  Plaintiff argues this evidence demonstrates that Defendant's formula was not based on old metallic formulas but instead on Plaintiff's "Know-How."

Clearly, whether or not Defendant utilized Plaintiff's "Know-How" to create its solvent-based magnetic paint is another issue of fact.  I find that Defendant has not demonstrated that there is no genuine dispute as to this fact and therefore it is improper to determine on summary judgment.

## Conclusion

For the reasons stated above, Defendant's motion for summary judgment (Docket No. 118) is ***denied***.


**SO ORDERED**

***/s/ Timothy S. Hillman***
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**
